## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RYAN A. MERGL, ESQ.                    )
                                       )
        Plaintiff,                     )
                                       )    2:21-cv-1335
        v.                             )
                                       )    Chief Judge Mark R. Hornak
THE HONORABLE DANIEL WALLACE;          )
THE COMMONWEALTH OF                    )
PENNSYLVANIA                           )
                                       )
        Defendants.                    )

### OPINION

**Mark R. Hornak, Chief United States District Judge**

This case centers on allegations that Defendants Daniel Wallace, President Judge of the Mercer County (PA) Court of Common Pleas, and the Commonwealth of Pennsylvania, violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 in regard to Judge Wallace's judicial dealings with Plaintiff.

Pending before the Court is Defendants' Motion to Dismiss the Plaintiff's Complaint (ECF No. 10). For the reasons stated below, Defendants' Motion to Dismiss (ECF No. 10) is GRANTED, but without prejudice. Consistent with Third Circuit precedent, the Court GRANTS Plaintiff leave to amend the Complaint.

### I.   BACKGROUND

#### a.   Brief Factual Summary[1]

Plaintiff Ryan A. Mergl is an attorney licensed to practice in the Commonwealth of Pennsylvania. (ECF No. 1, at 1.) Defendants are the Honorable Daniel Wallace ("Wallace"), a

---

[1] This statement of facts is based on the allegations set forth in Plaintiff's Complaint, (ECF. No. 1) which the Court must generally accept as true for purposes of ruling on the pending Motion to Dismiss. *Blanyar v. Genova Prods., Inc.*, 861 F.3d 426, 431 (3d Cir. 2017).

Judge of the Court of Common Pleas of Mercer County, Pennsylvania, and the Commonwealth of Pennsylvania, which is responsible for the administration of the Judicial Branch of the Commonwealth's government. (*Id.* at 3.) Plaintiff says that he suffers from two ailments that form the basis of his discrimination claim against Defendants: diabetes mellitus and the aftereffects of a concussion that he suffered in July 2020. (*Id.* at 1–2.)

Plaintiff is a lawyer. That said, the definition of the claims that Plaintiff seeks to assert is not crisply clear. In the Court's estimation, Plaintiff has seemingly pled that five distinct incidents involving him and Wallace constitute discrimination or retaliation in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act ("RA"), 29 U.S.C. § 794, or both. The first three incidents are asserted to relate to Plaintiff's diabetes, and the second two incidents appear to relate primarily to Plaintiff's concussion. (*See* ECF No. 1, at 4–10.)

**First**, on February 11, 2020, Plaintiff "had a conflict in his calendar" because he reports that he was scheduled to be in three places at once: in the Courtroom of Judge Ronald D. Amrhein, also of the Court of Common Pleas of Mercer County; in the Courtroom of Wallace; and also in Magisterial District Court 3-52-01. (ECF No. 1, at 4.) On February 8, 2020, Plaintiff had contacted the chambers of Judge Amrhein and explained the conflict; Judge Amrhein then granted Plaintiff permission to appear late to his courtroom. (*Id.*) "Plaintiff inquired whether he should contact [] Wallace[] or if Judge Amrhein's chamber would contact [Wallace] . . . Judge Amrhein's assistant stated that she would notify [] Wallace." (*Id.*)

After conducting his business in the other two courtrooms on February 11, 2020, Plaintiff then proceeded to Wallace's courtroom, where the scheduled judicial proceedings apparently took place as usual. (*See id.* at 5.) Wallace then "informed Plaintiff that he was not free to leave until

Wallace addressed another matter with [him]." (*Id.*) Wallace then reprimanded Plaintiff for being late and directed him that—in the future—Plaintiff would need to request permission to be late from Wallace directly, in writing, at least 24 hours in advance. (*Id.*) Plaintiff then explained to Wallace that he suffers from diabetes mellitus, and "sometimes due to his disability he requires additional time to prepare in the mornings, and that he cannot plan for or control when he has complications from his disability." (*Id.*) Plaintiff also told Wallace that "it would be a reasonable accommodation on those occasions that Plaintiff appear slightly late." (*Id.*) Wallace responded that "a contempt hearing would still be scheduled," and Plaintiff would be required to "prove" his disability to Wallace with "strong evidence." (*Id.* at 6)

**Second**, a month later on March 11, 2020, Plaintiff had a similar conflict among courtrooms on his calendar. (*Id.*) Plaintiff filed a motion to continue[2] the proceeding he was to have in front of Wallace, which Wallace denied. (*Id.*) Plaintiff then arranged to have another qualified attorney represent his client at the hearing in front of Wallace. (*Id.*) Wallace then entered a Rule to Show Cause against Plaintiff, requiring Plaintiff to show cause why he (Plaintiff) should not be held in contempt for failure to personally appear. (*Id.*) Though Wallace held a hearing on June 22, 2020, he ultimately dismissed the Rule to Show Cause. (*Id.* at 7.) At that proceeding, Wallace indicated that he "was only taking these actions against Plaintiff to get Plaintiff to act like every other member of the Mercer County Bar." (*Id.*)

The **third** incident took place after Plaintiff was struck by a car on July 9, 2020. (*Id.*) After the accident, Plaintiff suffered from blurred vision, headaches, memory problems, and other ailments, and as a result was advised to limit himself to a maximum of three hours of cognitive activity per day. (*Id.*) On August 3, 2020, Plaintiff participated in a status conference in front of

---

[2] Plaintiff's Complaint does not specify whether the motion to continue filed as to the March 11, 2020 proceeding complied with the parameters that Wallace laid out during their conversation on February 11, 2020.

Wallace. (*Id.* at 8.) At the end of the conference, Wallace stated that he had received a "disturbing email" that Plaintiff had requested a continuance of a hearing that was located over two hours away. (*Id.*) Wallace suggested that Plaintiff had acted inappropriately because he "appeared fine" to Wallace and stated that Plaintiff should be held in contempt for requesting a continuance due to his disability. (*Id.*) When Plaintiff attempted to explain his disability to Wallace, Wallace said, "I don't care" and left the courtroom. (*Id.*) Plaintiff then provided "all of the documentation of his disability" to Wallace via email. (*Id.*)

**Fourth**, on August 10, 2020, Plaintiff appeared before Wallace for a pretrial conference, where Wallace stated the Plaintiff must begin a two or three day trial, with approximately ten witnesses, the next day. (*Id.*) Plaintiff requested that the trial be continued thirty days to accommodate his disability. Wallace initially denied the request, stating that "Plaintiff did not have a disability." (*Id.*) Plaintiff and Wallace then got into an unpleasant verbal exchange, in which Wallace questioned the documentation that Plaintiff had previously provided. (*See id.*) In that exchange, Wallace also allegedly made several comments such as that Plaintiff "would milk the disability for all it was worth;" that Plaintiff was "out of line" for requesting an accommodation; and that Plaintiff's client "should get his money back." (*See id.* at 9.) Though Wallace stated that he would not accommodate Plaintiff until he provided satisfactory documentation of his disability (*id.* at 10), Plaintiff does not contest the Commonwealth's assertion that Wallace in fact granted the requested continuance. (*See* ECF No. 12 at 3, ECF No. 12-1, ECF No. 21)

Plaintiff's **fifth** and final allegation stems from a complaint that Plaintiff filed with the United States Department of Justice ("DOJ"). On August 24, 2020, Plaintiff filed a complaint against Defendant Wallace with DOJ asserting violations of Title II of the ADA. (ECF No. 1, at 10.) On September 2, 2020, Plaintiff filed a motion with Wallace, requesting that Wallace recuse

4

himself from all of Plaintiff's cases. (*Id.*) In response, Defendant Wallace took three actions that allegedly constitute retaliation: 1) he issued an Order of the Court without having a hearing, supposedly in violation of the Pennsylvania Rules of Court; 2) he refused to recuse himself from all of Plaintiff's cases (thus requiring Plaintiff to continue to appear in front of him); and 3) he "subject[ed] Plaintiff to further discrimination." (*See id.*) Wallace stated that he "would not recuse himself until [DOJ] 'determine[s] it has authority to open an investigation'" and "provides written notice of the opening of the investigation." (*Id.*)

### b. Procedural Background

Plaintiff filed his Complaint in this Court on September 21, 2021. (ECF No. 1.) The Defendants filed a Motion to Dismiss (ECF No. 10) and an accompanying Brief (ECF No. 12) on February 22, 2022. Plaintiff filed a Brief in Opposition (ECF No. 21) on March 28, 2022, and the time for Defendants to file a Reply expired on April 26, 2022 (*see* ECF No. 22). The Motion to Dismiss (ECF No. 10) is therefore ripe for disposition.

## II.   LEGAL STANDARD

When evaluating a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all non-conclusory allegations in the complaint as true, and the non-moving party "must be given the benefit of every favorable inference." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). However, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).

To state a plausible claim for relief, the non-moving party's factual allegations must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007), and must do more than "plead[] facts that are 'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *id.* at 557). However, the non-moving party "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009)).

## III.   <u>DISCUSSION</u>

Defendants have put forth three arguments in favor of their Motion to Dismiss: (a) that this Court lacks jurisdiction to adjudicate Plaintiff's claims under the *Rooker-Feldman* doctrine; (b) that Plaintiff has not stated a claim for which relief can be granted under the ADA or RA; and (c) that Defendants are entitled to immunity under the Eleventh Amendment. The Court treats each of these arguments in turn.

### a.   **The *Rooker-Feldman* doctrine**

Defendants argue that Plaintiff's claims should be dismissed under the *Rooker-Feldman* doctrine. (ECF No. 12, at 6–7.) *Rooker-Feldman* operates to prevent federal district courts from exercising jurisdiction "in certain circumstances[] where a federal suit follows a state suit." *Vuyanich v. Smithton Borough*, 5 F.4th 379, 384 (3d Cir. 2021) (quoting *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163–64 (3d Cir. 2010)).   The doctrine stems from 28 U.S.C. § 1257, which "vests authority to review a state court's judgment solely in the in the United States Supreme Court." *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005) (internal marks omitted)). The *Rooker-Feldman* doctrine is necessitated by the fact that "[t]he jurisdiction possessed by the District Courts is strictly original." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

Third Circuit law specifies a four-part test to determine when the *Rooker-Feldman* doctrine deprives federal courts of subject matter jurisdiction. A district court must dismiss a claim for relief under the *Rooker-Feldman* doctrine when and only when: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complains of injuries caused by the state-court's judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western*, 615 F.3d at 166 (quoting *Exxon Mobil*, 544 U.S. at 284) (internal marks omitted).

The *Rooker-Feldman* doctrine is plainly inapplicable to the first four incidents alleged by Plaintiff, which do not involve this Court's examination of a state court action in the nature of appellate review. The first and second incidents involved scheduling conflicts and conversations— not part of any formal proceeding—that Plaintiff and Wallace had regarding those conflicts and future potential conflicts. And as to each of them, no action was taken against Plaintiff by Wallace. (ECF No. 1, at 4–7.)

Similarly, the third incident involved a conversation between Plaintiff and Wallace, apparently regarding a proceeding in front of another judge. (ECF No. 1, at 7–8.) Finally, the fourth incident involved a continuance that Plaintiff sought and which was granted by Wallace; Plaintiff does not argue that this Court should review the granting of the continuance or take any action that would implicitly call the grant of the continuance into question. (ECF No. 1, at 8–10.) Instead, Plaintiff argues that the comments Wallace made in the process of adjudicating the continuance constitute a violation of the ADA. *Id.*

However, the fifth incident—Wallace's denial of Plaintiff's motion for recusal—presents a different scenario. Plaintiff contends that Wallace's refusal to grant the motion to recuse constitutes retaliation in violation of the ADA. (ECF No. 1, at 10.) However, *Rooker-Feldman*

bars federal courts from exercising jurisdiction when it would have the effect of reviewing state court judges' recusal decisions; the avenue for review of a state judge's recusal decision is through the relevant state appeal procedure followed by a petition for a writ of certiorari to the United States Supreme Court. *See Smith v. Bender*, 350 F. App'x 190, 193 (10th Cir. 2009); *Fieger v. Ferry*, 471 F.3d 637, 644 (6th Cir. 2006). Therefore, Defendants correctly assert that this Court lacks jurisdiction to adjudicate Plaintiff's claims regarding Wallace's refusal to recuse himself from Plaintiff's cases.

### b. Failure to State a Claim Under the ADA or RA

#### i. Legal Requirements

##### 1. Rehabilitation Act

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Because "Title II [of the ADA] and its implementing regulations incorporate the nondiscrimination principles of the Rehabilitation Act, and the statutes' core provisions are substantively identical," *Disability Rights New Jersey, Inc. v. Commissioner*, 796 F.3d 293, 301 n.3 (3d Cir. 2015) (internal citations and marks omitted), hereafter the Court refers to and analyzes the ADA alone. *See also Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (The RA and ADA are "to be interpreted consistently" and "have the same standard for liability"); *Jaros v. Ill. Dep't Corrs.*, 684 F.3d 667, 671 (7th Cir. 2012) ("The relief available" under the RA and ADA "is coextensive" and "the analysis governing each statute is the same except that the [RA] includes as an additional element the receipt of federal funds.").

Though the Court does not separately analyze the RA claim below, it is sufficient to note that Plaintiff has adequately pled, and Defendants do not dispute, that the Defendants receive federal financial assistance and are therefore subject to the RA. (ECF No. 1, at 3.)

## 2. <u>ADA</u>

### a. <u>Discrimination</u>

The ADA provides that "no qualified individual with a disability shall, by reason of such disability be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, to state a claim under Title II of the ADA, a Plaintiff must sufficiently plead that "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or who was subjected to discrimination by such an entity; (4) by reason of his disability." *Geness v. Admin. Off. of Pa. Cts.*, 974 F.3d 263, 273–74 (3d Cir. 2020).

The Court draws special attention here to the third prong of the ADA test, which Defendants have alleged is not satisfied in this case. The third prong has two disjunctive parts: the plaintiff must allege *either* that he was denied the benefits of the services, programs, or activities of a public entity *or* that he was otherwise "subjected to discrimination" by such an entity.

As to the first part of the third prong, the text of Title II does not elaborate on the meaning of "exclu[sion] from participation in or deni[al]" of the benefits of the services, programs, or activities" of a public entity. However, the phrase "services, programs, and benefits" is understood "broadly to 'encompass[] virtually everything a public entity does.'" *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018) (quoting *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016)); *see Yeskey v. Pa. Dep't Corrs.*, 118 F.3d 168, 170 (3d Cir. 1997) (stating that "a word in a statute

'must be given its ordinary or natural meaning,'" and that "[a]ctivity, *inter alia*, means 'natural or normal function or operation'"); *see e.g.*, *Furgess v. Pa. Dep't Corrs.*, 933, F.3d 285, 291 (3d Cir. 2019) (provision of showers in a correctional facility is a program, service, or activity within the meaning of Title II); *Kerrigan v. Phila Bd. Elec.*, No. 07-cv-687, 2008 WL 25052, at * 3 (E.D. Pa. Jan. 29, 2008) ("Access to polling places constitutes a service, program, or activity for purposes of Title II of the ADA.").

The latter category, prohibiting "discrimination" by public entities, has been characterized as a "catch-all" provision "prohibiting all discrimination by a public entity, regardless of the context." *Haberle*, 885 F.3d at 180 (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007)). Discrimination under the ADA "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations." *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)); *see also Berardelli v. Allied Svcs. Inst. of Rehab. Med.*, 900 F.3d 104, 117–18 (3d Cir. 2018) ("An essential feature of [the ADA's] prohibition on discrimination is . . . the duty to make reasonable accommodations and reasonable modifications.") (internal marks omitted).

It is not entirely clear when the "catch-all" provision of Title II might support a claim for harassment that is not linked to a specific, adverse action akin to hostile work environment claims in the Title VII context. Some courts have recognized that Title II supports such claims when school administrators ignore severe, disability-based peer-on-peer bullying. *See, e.g.*, *K.M. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (finding "a school district's deliberate indifference to pervasive, severe, disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities" to be "actionable under Section 504 [of the RA] and Title II [of the ADA]"). However, this Court has not found, nor have

the Parties identified, a case outside of the public K-12 schooling context where Title II was found to support a harassment-based claim divorced from a plaintiff's inability to access a specific program, service, or activity. *See Latham v. Acton*, No. 19-cv-258, 2020 WL 6122941, at * 9 (D. Alaska 2020) (assuming without deciding that Title II supports a harassment claim but finding that two phone calls to the plaintiff did not rise to an actionable level of harassment).

In any context, however, plaintiffs alleging unlawful harassment must plead that the defendant's conduct was so severe and persistent so as to fundamentally alter the nature of their relationship with the defendant and, in doing so, deprive them of a statutory right. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (harassment under Title VII includes not just "economic" or "tangible" discrimination, but also harassment "that is *sufficiently severe or pervasive* to alter the *conditions of the victim's employment*") (emphasis added); *Hall v. Millersville Univ.*, 22 F.4th 397, 408 (3d Cir. 2022) (to prevail on a Title IX harassment claim, plaintiff must allege that harassment was "so *severe, pervasive, and objectively offensive* that it *deprive[s]* [plaintiff] of [] *access* to the educational opportunities or benefits provided by the school") (emphasis added).

### b. Retaliation

Under the ADA, it is unlawful to retaliate against an individual because they have "opposed any act or practice made unlawful by the chapter" or "made a charge . . . or participated in any manner in any investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Thus, to establish a prima facie case of retaliation, a plaintiff must allege that "(1) he engaged in protected activity, (2) he suffered an adverse action after or contemporaneous with the protected activity, and (3) [there is] a causal connection between the protected activity and the adverse action." *Snider v. Pa. Dep't Corrs.*, 505 F. Supp. 3d 360, 420 (M.D. Pa. 2020).

11

### c. **Heightened Standard for Compensatory Damages**

A plaintiff seeking compensatory damages under the ADA—the only relief sought in this case—must also allege intentional discrimination, which requires pleading at least deliberate indifference. *Haberle*, 885 F.3d at 181. A plaintiff claiming deliberate indifference, in turn, must show (1) "knowledge that a federally protected right is substantially likely to be violated" and (2) "failure to act despite that knowledge." *Geness*, 974 F.3d at 274 n.11 (quoting *Haberle*, 885 F.3d at 181). The "knowledge" referred to in the first prong of the deliberate indifference test is *actual knowledge*; "allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 n.26 (3d Cir. 2013).

### ii. **Sufficiency of the Factual Allegations**

At the outset, the Court briefly addresses the necessary elements of an ADA clam that are not disputed here. As discussed above, a plaintiff seeking relief under the ADA must allege that he is a qualifying individual with a disability. Moreover, Title II of the ADA only applies to public entities. Plaintiff claims that, by virtue of his diabetes and the aftereffects of his concussion, he is a qualifying individual with a disability and therefore is protected by the ADA (*see* ECF No. 1, at 2–3). He also claims that the Court of Common Pleas of Mercer County is a "public entity" under the ADA and therefore is required to comply with its provisions. (*See id.*)

Defendants do not argue that Plaintiff's claims fail on any of these grounds. However, the Court briefly notes that whether and when diabetes qualifies as a disability under the ADA is a matter of some dispute. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223–24 (5th Cir. 2011) (collecting cases and concluding that a plaintiff whose diabetes treatment requires "only modest dietary and lifestyle changes" failed even to raise an issue as to whether he was disabled

under the ADA); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34–35 (1st Cir. 2010) (stating that "when and under what conditions diabetes is considered a disability for ADA purposes 'is a matter of degree'" but holding that plaintiff with diabetes causing only minor limitations on seeing and eating failed to even raise an issue as to disability status under the ADA) (quoting *Sepulveda v. Glickman*, 167 F. Supp. 2d 186, 191 (D.P.R 2001)).

Instead, the crux of Defendant's argument that Plaintiff has not stated a claim under the ADA is that "none of the five instances Plaintiff cites in his Complaint evidence a situation in which Plaintiff was excluded from participation in or denied the benefits of the Court's services or otherwise discriminated against by reason of his disability." (ECF No. 12, at 10.) The Court addresses each of the five incidents in turn, and then—to determine whether Plaintiff has alleged "severe and pervasive" discrimination sufficient to fundamentally alter the conditions of his interaction with Defendants so as to plausibly constitute unlawful harassment—considers Plaintiffs' allegations as a whole.

### 1.  Incident 1: February 11, 2020

The first instance of alleged discrimination took place on February 11, 2020, when Plaintiff's own calendar was triple booked. Because of the conflict, Plaintiff appeared late to Wallace's courtroom. When Wallace addressed Plaintiff directly about his lateness, Plaintiff explained that his diabetes occasionally (and unpredictably) requires additional time to prepare in the morning. But that condition does not appear to have had anything to do with Plaintiff's being late on the day at issue. His tardiness was based on his triple-booking his calendar. In response, Wallace stated that, if Plaintiff were going to be late again in the future without advanced permission from Wallace himself, a contempt hearing would be scheduled, and Plaintiff would be required to prove his disability with "strong evidence."

These events do not constitute discrimination under Title II of the ADA because Plaintiff has not claimed that he was deprived of access to the courts as a result, that Wallace took any adverse action against him, or refused to accommodate him—let alone that Wallace did so by reason of his disability, or otherwise treated him differently than any other lawyer.

Nowhere in Plaintiff's Complaint does he allege that he was ever actually late to proceedings in front of Wallace as a result of his diabetes, or that his diabetes had anything to do with the Plaintiff triple-booking his court calendar. He merely explained to Wallace that his diabetes was one potential reason that he *might* be late *in the future*. Moreover, Wallace's response does not facially constitute a denial of an accommodation; requesting appropriate documentation of a claimed disability does not constitute discrimination under the ADA. *Cf.* EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the ADA, No. 915.002 (July 27, 2000), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees (an employer may "ask an employee for documentation when s/he requests a reasonable accommodation[; t]he employer is entitled to know that an employee has a covered disability that requires a reasonable accommodation"); *Tchankpa v. Ascena Retail Grp., Inc.*, 951  F.3d 805, 812 (6th Cir. 2020) (as part of the good faith process of exploring possible accommodations, an employer "may require documentation supporting an employee's requested accommodation"); *Taylor*, 184 F.3d at 317 (once an employer is given notice that an employee is requesting accommodations under the ADA, it can "show [its] good faith in a number of ways . . . such as "request[ing] information about the condition and what limitations the employee has"); *Moore v. CVS Rx Svcs, Inc.*, 142 F. Supp. 3d 321, 346 (M.D. Pa. 2015) (granting an employer's motion for summary judgment on a Title I claim when "the record demonstrate[d] that Defendant was willing to continued accommodating

Plaintiff, *ad infinitum*, as long as Plaintiff simply submitted adequate documentation"). This incident standing alone does not support an ADA claim.

## 2.   **Incident 2: March 11, 2020**

As set forth above, on March 11, 2020, Plaintiff had a similar conflict resulting from the Plaintiff double booking his calendar. Plaintiff filed a motion to continue his proceedings in front of Wallace, which Wallace denied. When Plaintiff did not appear for his proceeding in front of Wallace but instead arranged for another attorney to appear in his stead, Wallace later held a hearing for a Rule to Show Cause why Plaintiff should not be held in contempt for his failure to appear personally. Ultimately, Wallace dismissed the Rule to Show Cause without any action being taken against Plaintiff.

Plaintiff again fails to plead a violation of the ADA as to this situation. Plaintiff was not denied access to the courts, nor did Wallace take any adverse action against him. Wallace did not hold Wallace in contempt, and, notably, Plaintiff does not claim that he provided any documentation of any disability to Wallace until after March 11, 2020. (*See* ECF No. 1, at 6–10.) (In fact, it is unclear whether he ever provided Wallace with documentation of his diabetes.[3] (*See id.*)) Further, and once again, there is nothing in the record "showing" that any disability of the Plaintiff's had anything to do with Plaintiff's non-appearance or Wallace's actions.

Thus, at most, the injury that Plaintiff alleges is that he was required to attend a contempt hearing. Whether or not it is wise judicial practice to hold a contempt hearing when a continuance is denied and a lawyer sends a substitute without leave of court, in the Court's judgment, a state

---

[3] Plaintiff states that his diabetes "is well known and documented at the Mercer County Courthouse." (ECF No. 1, at 6.) However, Plaintiff does not state that he ever informed Wallace that his diabetes had already been documented with the Court or that he otherwise pointed Wallace in the direction of existing documentation. And Plaintiff offers nothing other than his own conclusory assertion in support of his speculative allegation that boils down to "Wallace must have known." That speculation is wholly insufficient to "show" a claim for relief.

trial judge doing so as alleged does not rise to the level of discrimination by reason of a disability required to violate the ADA, especially when no sanction was imposed against the Plaintiff.

### 3.   Incident 3: August 3, 2020

As described above, Plaintiff was involved in a car accident on July 9, 2020, which left him with blurred vision, memory problems, headaches, and other ailments. As a result, he was advised to limit himself to a maximum of three hours of cognitive activity per day. On August 3, 2020, Plaintiff participated in a status conference with Wallace, and Wallace stated that he had received a "disturbing email" that Plaintiff had requested a continuance of a hearing, apparently in front of another judge. Wallace then stated that Plaintiff "appeared fine" and that he should be "held in contempt" for requesting the continuance from the other judge. When Plaintiff tried to explain, Wallace said "I don't care."

Taken on its own as pled, this incident does not violate Title II. Here, Wallace was opining about the propriety of Plaintiffs behavior in proceedings in front of another judge. Though Wallace's interpretation of events may have been unfriendly to Plaintiff, Wallace's voicing his opinion did not hinder Plaintiff's ability to carry out his business at the court nor did it involve the denial of any requested accommodation. The conference was held, Plaintiff attended, and there is no allegation that the disposition of the matters involved in that proceeding was in any way out of the ordinary.

### 4.   Incident 4: August 10, 2020

A few days later, Plaintiff appeared in front of Wallace for a pretrial conference, where Plaintiff requested a 30-day continuance of a trial that was scheduled to begin the next day. Wallace initially denied the request, and then Plaintiff and Wallace got into an unpleasant verbal exchange, in which Wallace allegedly made some disrespectful statements about Plaintiff and his

disability—for instance that Plaintiff "did not have a disability;" that Plaintiff "would milk his disability for all it was worth;" that Plaintiff was "out of line" for requesting a continuance; and that Plaintiff's client "should get his money back." Wallace also questioned the documentation that Plaintiff provided and stated that he would not accommodate Plaintiff until he received satisfactory documentation of Plaintiff's disability. However, importantly for these purposes, Wallace granted the requested continuance. Thus, as now pled, to the extent the Plaintiff wanted an accommodation in the nature of a continuance, he received it, and to the extent such a continuance was a "benefit" of the court's "services, programs or activities," he received it.

The exchange between Plaintiff and Wallace on August 10, 2020, as pled does not, on its own, rise to the level of a violation of the ADA. Plaintiff got what he asked for—a continuance— and therefore was not "denied the benefits of the services, programs, or activities" of the state court.

### 5. <u>Incident 5: Wallace's Refusal to Recuse</u>

On August 24, 2020, Plaintiff filed a Complaint against Wallace with DOJ, alleging violations of Title II. On September 2, 2020, Plaintiff filed a motion with Wallace requesting that Wallace recuse himself from Plaintiff's cases. Wallace denied the motion, stating that he "would not recuse himself until [DOJ] 'determine[s] it has authority to open an investigation'" and "provide[s] written notice of the opening of the investigation."

Plaintiff claims that the act of filing a complaint with DOJ is a protected activity under the anti-retaliation provisions of the ADA, and that Defendant Wallace retaliated against Plaintiff in that he issued an order of the court without a hearing;[4] refused to recuse himself from Plaintiff's

---

[4] Plaintiff claims that Wallace's act of issuing an order without having a hearing "violat[ed] Plaintiff's and his client's rights" and "the Pennsylvania Rules of Court." (ECF No. 1, at 13.) However, Plaintiff has not specified how Wallace's failure to hold a hearing violated his clients' rights or the Pennsylvania Rules of Court. And his assertions in this regard are wholly conclusory.

cases so that Plaintiff was forced to continue to appear in front of him; and subjected Plaintiff "to further discrimination."[5] As discussed above, the *Rooker-Feldman* doctrine prevents this Court from reviewing Plaintiff's claims regarding the merits of Wallace's recusal decision. This is a particularly apt rule in this situation in that any duty of recusal that Wallace might have had would have been generated by state law and/or the Code of Conduct for state judges, and not the ADA. Thus, review of Wallace's decision to not recuse best lies with the state court entities charged with engaging in such review. However, even if this Court had jurisdiction to consider whether Wallace's refusal to recuse constituted retaliation in violation of the ADA, on the facts alleged here, no violation has been sufficiently pled.

Plaintiff has not cited a Pennsylvania Rule of Court, nor is this Court aware of one, prohibiting the entry of an order denying a recusal motion (or ruling on any other motion) without the state court holding a hearing. Whether or not the Pennsylvania Rules of Court require a hearing before entering an order denying a motion to recuse, in order to make out a claim for ADA retaliation, Plaintiff would have to sufficiently allege a causal connection between Wallace's failure to hold a hearing and Plaintiff's filing a complaint with DOJ. In other words, Plaintiff would have to sufficiently allege that Wallace failed to hold a hearing[6] *because* Plaintiff filed a complaint

---

[5] Defendant argues that Plaintiff's retaliation claim is barred by judicial immunity. This claim is unavailing: when a judge is sued in their *individual capacity*, they are indeed entitled to immunity for all actions taken in the scope of carrying out their judicial duties. *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978). However, suits against state actors "in their official capacities are tantamount to suits against the state *qua* state," *Cullen v. Pennsylvania Department Corrections*, No. 09-cv-1562, 2012 WL 6015721, at *1 (W.D. Pa. Dec. 3, 2012), and judicial actors sued in their official capacities have "no immunity whatsoever." *Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206, 211 (3d Cir. 2005). The claims asserted against Wallace here are in his official capacity, which in any event means that they are treated as tantamount to claims against the Commonwealth as a State. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" because "the real party in interest is the entity.") (internal marks and citations omitted).

[6] Plaintiff's Complaint does not indicate that he moved the court to hold a hearing or filed a motion for reconsideration seeking such a hearing after his recusal motion was denied. (*See* ECF No. 1.)

with DOJ *and* that Wallace would have held a hearing for another, similarly situated individual who had not filed such a complaint, *and* that not holding a hearing (as opposed to the substantive decision not to recuse) was an adverse action in and of itself. Plaintiff has not alleged facts sufficient to support such inferences. And this Court is not aware of any statute, rule or decisional law that mandates that a judge hold a hearing before ruling on a recusal motion, and Plaintiff points to none. He also does not point to Judge Wallace procedurally or substantively treating his recusal motion any differently than he treats other such motions.

Similarly, on the facts alleged in the Complaint, Wallace's refusal to recuse himself does not constitute retaliation because it is not, in and of itself, an "adverse action." Though the meaning of adverse action in the Title II context is not as well-explored as in the Title I employment context, "[a]n adverse action must meet a 'threshold level of substantiality' before it can serve as the basis of a retaliation claim." *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) (rude behavior and bumping into plaintiff's car in a parking lot do not constitute adverse action)). "If the defendant's actions had no tangible, negative effect on the plaintiff, no adverse action exists." *Ganstine v. Sec'y, Fla. Dep't Corrs.*, 502 F. App'x 905, 911 (11th Cir. 2012) (confiscation of a prisoner's notes and extra work assignments do not constitute adverse actions).

With respect to Plaintiff's ability to conduct his business in front of the court, the mere fact that Wallace continued to preside over Plaintiffs' cases is not in itself an adverse action. If Wallace conducted proceedings, or issued orders, that were improvident, erroneous, or biased *because* of the fact that Plaintiff was involved as counsel and had filed the DOJ complaint, rather than on the merits, Plaintiff's retaliation claim might be viewed through a different lens. But Plaintiff has not made a "showing" sufficient to support such allegations.

19

Finally, Plaintiff also generically alleges that Wallace retaliated against Plaintiff in that he "subject[ed] him to further discrimination." This is a legal conclusion offered with no supporting context or facts. In fact, the Complaint does not make any allegations whatsoever about what happened (if anything) after Wallace denied Plaintiffs' motion for recusal. (*See* ECF No. 1, at 10, 13.) Because this allegation is nothing more than an unsupported legal conclusion, it is not sufficient to defeat 12(b)(6) motion. *See Cambridge Ret. Sys.*, 908 F.3d at 878–79.

Any claim for retaliation must be premised on an adverse action having been taken against a plaintiff by a defendant, with a sufficient causal link shown between statutorily protected conduct and the adverse action. *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006). What is missing from the claims asserted here is the existence of any cognizable adverse action taken against Plaintiff by Wallace that is causally linked to protected conduct by the Plaintiff. As a result, Plaintiff's effort at pleading such a claim is insufficient.

### 6.  Incidents taken as a whole

As discussed above, the Court is not aware of authority holding that harassment generally, free-standing from any deprivation of a service, activity, or program of a public entity, is actionable under Title II. However, the Third Circuit has suggested that the "catchall" provision of Title II should be broadly interpreted, *see Haberle*, 885 F.3d at 180, so the Court assumes without deciding that Title II could in theory support such a cause of action.

Taken as a whole, the incidents Plaintiff complains of do not rise to an actionable level of harassment. Typically, harassment must be sufficiently severe and pervasive to alter the overall nature of the Plaintiffs' experience in the relevant environment and thereby deprive him of a right secured by statute. For instance, in the employment context, the Supreme Court has held that Title VII is not a "general civility code" and "[t]he prohibition of harassment on the basis of sex . . .

forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Svcs, Inc.*, 523 U.S. 75, 81 (1998). Moreover, to prevail on a Title IX harassment claim, a plaintiff must allege that the harassment was severe enough to deny the plaintiff "access to the educational opportunities or benefits provided by the school." *Hall*, 22 F.4th at 408.

In assessing such assertions, a court is generally required to consider the totality of the circumstances, including the frequency of the allegedly discriminatory conduct, its severity, whether it was physically threatening or humiliating, whether it was a "mere" offensive utterance, and whether it unreasonably interfered with the right allegedly violated. *See Thomas v. Bronco Oilfield Svcs.*, 503 F. Supp. 3d 276, 298–99 (W. D. Pa. 2020).

Although the Court does not doubt that Plaintiff's interactions with Wallace may have been at times unpleasant, Plaintiff has not pled facts sufficient to support the inference that the overall nature of his litigation of cases before Wallace was so altered by Wallace's conduct relative to the incidents alleged in the Complaint that they thereby deprived him of an ADA-protected right. In the first two incidents, as pled, Wallace was responding to Plaintiff's double or triple booking his own court appearance calendar. There is no assertion that Plaintiff having done so was caused by anything other than Plaintiff's own choices, and Plaintiff has alleged no connection to any covered disability. And in each episode pled, the Plaintiff was either not sanctioned in any way and/or received the judicial relief he had requested. Considering these episodes in totality and as pled, they do not objectively rise to the level at which they could be considered severe or pervasive.

### 7.  Intentional Discrimination

As discussed above, a plaintiff seeking compensatory damages under the ADA must allege intentional discrimination, which requires pleading at least deliberate indifference. *Haberle*, 885

F.3d at 181. Deliberate indifference, in turn, involves *actual knowledge* that a federally protected right is substantially likely to be violated. *S.H.*, 729 F.3d at 266 n.26.

Even if the Court were persuaded that Wallace's alleged actions constituted violations of the ADA, Plaintiff has not alleged facts sufficient to support the inference that Wallace had actual knowledge that his behavior would violate the statute. Though Plaintiff does not directly address the deliberate indifference issue, the Court notes that Plaintiff's asserting that Wallace "should have known" that his conduct would violate the ADA is not enough to meet the mark. *See id.*

### 8. **Ripeness**

The Court has treated, and Defendant has framed, the issue here as whether, based on the facts alleged in Plaintiff's Complaint, a violation of the ADA or RA *has occurred*. As detailed above, the Court has determined that, at this point, the Plaintiff has not "shown" that any such violation has occurred. However, the Court notes that an alternative reading of Plaintiff's Complaint is that—particularly with respect to Defendant Wallace's denial of Plaintiff's recusal motion, viewed in light of the other events alleged in Plaintiff's Complaint—a violation of the ADA *might* occur in the future. For instance, if Wallace fails to recuse in a situation where the law would compel it, or in a situation in which Wallace would have recused, but in not recusing from a case handled by the Plaintiff, subjected Plaintiff to differential treatment because of a disability or his filing of the DOJ complaint, then perhaps an actual harm would have occurred. To the extent that such is Plaintiff's claim, it is both unstated and not yet ripe for adjudication.[7]

Article III of the Constitution limits the "judicial Power" of the United States to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2. "Courts enforce the case-or-controversy requirement through several justiciability doctrines that 'cluster about Article III.'"

---

[7] [C]onsiderations of ripeness are sufficiently important that the court is required to raise the issue *sua sponte* even though the parties do not." *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003).

*Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs*, 580 F.3d 185, 190 (3d Cir. 2009) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Those doctrines "include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *Id.*

Ripeness assesses "whether a party has brought an action prematurely[] and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Id.* (citing *Peachlum*, 333 F.3d at 433.) "Ultimately, the case must involve a 'real and substantial controversy . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

In determining whether a case is ripe for review, courts generally examine: (1) "the fitness of the issues for judicial decision;" and (2) the "hardship of the parties of withholding court consideration." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (citing *Abbott Lab'ys v. Gardner,* 387 U.S. 136, 149 (1967)). Under the "fitness for review" prong, courts consider "whether the claim involves uncertain and contingent events that may not occur as anticipated or at all; the extent to which a claim is bound up in the facts; and whether the parties to the action are sufficiently adverse." *Phila. Fed'n Tchrs. v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998). If an issue "would . . . benefit from . . . further factual development" placing the court in a "better position to adjudicate the issues in the future," the fitness prong is not satisfied. *See Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d 351, 359 (1st Cir. 2003)). Under the "hardship" prong, courts consider whether the challenged action creates a "'direct and immediate' dilemma for the parties" such that withholding review will impose costly choices on the parties. *Phila. Fed'n Tchrs.*, 150 F.3d at 323 (quoting *Abbott Lab'ys*, 387 U.S. at 152).

In some contexts—particularly those involving requests for declaratory or injunctive relief—the threat of future harm can be sufficiently immediate to constitute a cognizable injury for ripeness[8] purposes. *See, e.g.*, *Free Speech Coal., Inc. v. Att'y General*, 825 F.3d 149, 167 n.15 (3d Cir. 2016) (threat of future inspection under federal statute, which necessitated that plaintiffs continually incur costs of compliance, sufficient to satisfy ripeness requirement even though no inspection program had been in place for eight years); *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154–55 (3d Cir. 1995) (dispute regarding insurance coverage for non-familial attendant care services ripe even though record did not demonstrate that plaintiff had ever sought out or intended to ever seek out attendant care services).

However, here, to the extent that Plaintiff's Complaint amounts to an allegation that Defendant Wallace's conduct *might* evolve into a violation of the ADA in the future, that claim is not ripe for review. The events forming the basis of that allegation are speculative, and to the extent that the difficulty between Plaintiff and Wallace continues or escalates, adjudicating the issues at a later date would afford the Court the benefit of additional factual assertions of actual present or past cognizable harm. *See Pearson*, 642 F.3d at 684.

### c.  **Eleventh Amendment Immunity**

Defendants' final argument in favor of dismissing Plaintiff's Complaint is that they are entitled to immunity under the Eleventh Amendment. (ECF No. 12, at 7–14.) Because of the nature of the Eleventh Amendment analysis in Title II cases, and Plaintiff's failure at this point to state a claim under the ADA, the Eleventh Amendment analysis is premature.

---

[8] The probability that a plaintiff will be harmed at some time in the future is often couched as bearing on the injury-in-fact requirement to show Article III standing. *See, e.g.*, *N.J. Physicians, Inc.* v. *President of U.S.*, 653 F.3d 234, 238 (3d Cir. 2011). However, the two concepts are conceptually intertwined: "[S]tanding is about *who* can sue while ripeness is about *when* they can sue, though it is of course true that if no injury has occurred, the plaintiff can be told either that *she* cannot sue, or that she cannot sue *yet*." *Presbytery*, 40 F.3d at 1462 (quoting *Smith v. Wisc. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994)).

Our Court of Appeals has long recognized that the Courts of Common Pleas in Pennsylvania, and their Judges, are considered to be "the state" for Eleventh Amendment purposes. *See Banks v. Ct. of C.P. FJD*, 342 F. App'x 818, 820 (3d Cir. 2009); *Benn v. First Jud. Dist.*, 426 F.3d 233, 238–41 (3d Cir. 2005). In order to validly abrogate the immunity that states enjoy under the Eleventh Amendment, Congress must (1) unequivocally express its intent to subject the states to liability and (2) act pursuant to a valid exercise of power—that is, through a statute "passed pursuant to a constitutional provisions granting Congress the power to abrogate." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 59 (1996).

The first requirement is met in the case of Title II of the ADA. Title II provides that "a State shall not be immune under the eleventh amendment to the Constitution of the United States from an action . . . for violation of this chapter." *See* 42 U.S.C. § 12202. The Supreme Court has acknowledged this as an unequivocal expression of Congress' intent to abrogate state sovereign immunity. *United States v. Georgia*, 546 U.S. 151, 154 (2006).

However, whether the second requirement is met in this case is less clear. The Supreme Court has identified only two constitutional provisions conveying to Congress the power to abrogate States' immunity: the Fourteenth Amendment and the Commerce Clause. *See Seminole Tribe*, 517 U.S. at 59–60. Previously, the Supreme Court has held that, under the enforcement power granted to it by § 5 of the Fourteenth Amendment, Congress validly abrogated states' sovereign immunity for conduct that violates Title II of the ADA and at the same time *also* violates the Fourteenth Amendment. *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004) (holding that sovereign immunity was validly abrogated by Title II as to conduct that implicates "the fundamental right of access to the courts"). However, because the Court has declined to consider the validity of Title II "as an undifferentiated whole," *id.* at 530, in cases where Title II creates a

private cause of action for damages against the States for conduct that does *not* also violate the 14th Amendment, the validity of Congress's purported abrogation of state sovereign immunity is unclear.

Courts considering whether sovereign immunity has been abrogated must "conduct a 'claim-by-claim' analysis." *Geness*, 974 F.3d at 270 (quoting *Georgia*, 546 U.S. at 159). Courts are directed to examine: (1) which aspects of the State's alleged conduct allegedly violated Title II; (2) to what extent the alleged conduct *also* violated the Fourteenth Amendment; and (3) insofar as the conduct that forms the basis of the claim violated the ADA but not the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Georgia*, 546 U.S. at 159.

Because Plaintiff has not stated a claim under the ADA, the Court cannot conduct the analysis required by *Georgia* and, thus, any conclusions regarding sovereign immunity in this context would be premature. However, the Court notes that Plaintiff has neither alleged a violation of the Fourteenth Amendment nor pointed to case law to guide the Court's analysis of sovereign immunity in a situation where the ADA was violated but the Fourteenth Amendment was not.

### d.  <u>Leave to Amend</u>

It is well established under Third Circuit precedent that "district courts must offer amendment [in civil rights cases]—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Mulllin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017) (quoting *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007)). There is no suggestion in this case that amendment would necessarily be futile—such as when the complaint would facially be time-barred, *see Jackson v. Washington Auto Mall*, No. 20-cv-367, 2020 WL 1974764, at *1 & n.1 (W.D. Pa. Apr. 24, 2020)—or that allowing

amendment would be inequitable. Thus, the Court GRANTS Plaintiff leave to amend his Complaint.

## IV.    <u>CONCLUSION</u>

For the reasons set out above, the Court GRANTS Defendants' Motion to Dismiss (ECF No. 10) without prejudice. Plaintiff may file an Amended Complaint. Any Amended Complaint must be filed within fourteen (14) days of the date of this order. If such is not so filed, the dismissal of Plaintiff's claims shall be converted to a dismissal with prejudice without further notice or Order.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated:  September 30, 2022